In re LAMONT'S ESTATE.

LAMONT v. CACHE VALLEY BANKING CO. et al.

No. 5982.   Decided May 25, 1938.   (79 P. 2d 649.)

Rehearing denied July 6, 1938.

L. E. *Nelson* and *Leon Fonnesbeck,* both of Logan, for appellant.

*George D. Preston* and *M. C. Harris,* both of Logan, for respondents.

MOFFAT, Justice.

The issues of this cause arise out of the filing of a petition by or on behalf of the majority of the children of Mary Lamont for the appointment of a guardian of her estate, and a protest thereto filed by one of her children, a son, who claims to be the owner of the property alleged in the petition to be the property of Mary Lamont. As grounds for the appointment of a guardian, it is alleged that Mary Lamont is over eighty years of age and has for more than seven years been in failing health and becoming increasingly senile, to the extent that her mind has become impaired and her memory has so failed that she is incompetent to transact ordinary business or properly care for her property unassisted. That she is likely to be deceived by persons interested in securing her property. That certain persons claim to have received deeds and conveyances to her property.

That such deeds and conveyances were obtained by undue influence and because of the incompetency of Mary Lamont.

Andrew Lamont, a son, appeared and filed a protest. He alleges that Mary Lamont is, and at all times mentioned in the petition was, of sound mind. He further alleges that she has no property, and does not want a guardian appointed. Other and collateral allegations are made in both the petition and the protest. The cause was tried to the court. The evidence likewise went into collateral matters, and some findings were broader and more inclusive than necessary.

The record discloses it was the intention of the trial court to limit the issues to one matter, and that matter was the question of competency of Mary Lamont. Questions as to validity of deeds or conveyances or the competency of Mary Lamont years before are not in issue in the instant case and should not and will not be discussed or more than incidentally referred to; nor will this court determine any matter other than the issue of competency or want of it and the appointment of a guardian.

Eleven errors are assigned. They are condensed into four situations for argument, and each of them goes to the question of sufficiency of the evidence to support the findings and what follows therefrom. Collateral matters as to validity of deeds or the failure of the court to find on the matters referred to, we deem to be matters for future determination, if at all, and we will not discuss them.

The following is a summary of the testimony of Mary Lamont: She was not sure as to the number of acres in the farm, or how many cows were on the farm when Andrew took it over, nor when the land was bought. She stated that her memory was bad. That she was eighty years old, but too young to make a will. Although she had deeded all the land to Andrew, she said she did not want him to have all of it. Certain matters relating to her property that happened the day before she did not remember. She signed a document asking for the appointment of a guardian, yet did not remember it, or, if she did, she did not understand

it, and then said she did not want a guardian appointed. She did not seem to realize she had conveyed away all her property, yet thought if it would deprive her of making a will it was wrong.

### William I. Sorensen testified as follows:

"Q. Have you had business transactions with Mrs. Lamont? * * * A. Yes, I have. * * * I am in the coal business. She purchased coal from me for a number of years. Q. Have those transactions discontinued, or do they exist at the present time? A. The last two years I have not done business with Mrs. Lamont. Mainly I have done business with Andrew. Q. You may state to the court the circumstances or the facts that come to your mind as to the reasons why that happened. A. Well, the reason is because Mrs. Lamont was somewhat forgetful. That there was one account that we could not agree on. She felt like it was paid, and I knew it wasn't. I appealed to Andrew. Andrew says I know the account is due, therefore, I will take care of it, and from now on, I will see that her accounts are taken care of. I know the account; I know the sale, and therefore it will be better to do business that way. I know the condition of her mind. * * * Q. You know, as a matter of fact, that she has stayed very close to home? A. Yes. What I know about her now is just what I have heard from her children, grown children, that she was not as mentally strong as she had been during those years that I was able to talk with her. She was able to converse more intelligently."

### Robert Lamont testified as follows:

"Q. When you got up there (Arimo) did she make any peculiar statement about the time you got out of the car? A. When we got there, she got out, stepped out of the car. It was evening—dark, and she says, 'Well, I will just walk across the lot to home,' figuring that she was in Mendon, I believe. * * * Q. While your mother has been up there, Mr. Lamont, you may state to the court whether or not she has said things that would indicate she didn't know where she was? A. Well, she said, 'I will go across lots to home,' and a little before she says, 'I wonder if Andrew wont soon come and get me.' And she started out one night to go home. I was gone away from the house, and my wife, she was gone, and the little ones were left there. She wanted to go home. She got out on the track, and they stopped her and told her that she was not in Mendon. She says, 'Oh, I have lived here a long time; everybody knows me, and I know everybody here.

* * *'  On the way down yesterday, she thought she was on the way to Ogden. She says, 'I will go to Grace's place instead of Nan's, * * *' Q. What would you say Mr. Lamont, as to the fact as to whether or not your mother is easily influenced? A. Very much so."

The remainder of the testimony with regard to general incompetency is similar. Many witnesses testified as to Mary Lamont's forgetfulness. This might tend to render one incompetent to carry on ordinary business, when it is so pronounced as to create a danger of imposition. Many of the statements of Mrs. Lamont, made during the course of the trial, are also testified to by the witnesses as being erroneous conceptions of the actual facts.

The trial court having had the benefit and opportunity of seeing and observing the witnesses, their grasp of the situations presented, their candor or the want of it, and having made findings and conclusions upon the matter of the competency of Mary Lamont at the time the petition was filed and heard, we think the findings are sufficiently supported and should not be disturbed. Her condition in the past that might tend to affect her competency or raise a question as to the validity of any deeds or conveyances, her susceptibility to undue influence, fraud, duress, deceit or imposition, are matters all parties should welcome the presentation and determination of at as early a date as possible, and while witnesses are available with memories of events and ability to state their experiences and knowledge of facts. These matters will not be made clear or more certain by delays.

The fact that Mrs. Lamont was eighty-four years of age raises no presumption of incompetency. The statute provides for the appointment of guardians for "persons who are insane or from any cause mentally incompetent to manage their property," and draws a distinction between those who are "incompetent," "mentally incompetent," and "incapable," by reason of old age, disease,

weakness of mind, or from any other cause, unable unassisted to manage business or property, and a person who is insane (R. S. Utah 1933, Secs. 102-13-19, 102-13-20), and does not conflict with the definition of "insane" persons found in Sec. 88-2-12 (16), R. S. 1933, where it is said: "The words 'insane person' include idiots, lunatics, distracted persons and persons of unsound mind." One likely to be easily deceived or imposed upon by artful and designing persons for the reasons stated, and thus lose his property, is entitled to the protection of the guardianship of the court over his property.

Appellant argues that because the alleged incompetent has conveyed away all of her property (since under certain provisions of the statute a ward is expected to have property to be protected), there can be no guardian appointed. The position is untenable. *Somes* v. *Skinner*, 16 Mass. 348; Woerner, Am. Law of Guardianship, § 56; 28 C. J. 1248, § 427. As well say, assuming a person is incompetent and has been deprived of property by fraud, deceit or undue influence, that no action could be brought; or assuming incompetency during life, that no administrator could be appointed after death because there was no estate. The statement of the situation is its own refutation. If an artful and designing person could succeed in taking advantage of "incompetency" and secure a conveyance of all of the property, and then defeat guardianship on the ground that the alleged incompetent must own property, a perfect method has been found to deprive incompetents of their property.

An allegation sufficient to show prima facie an interest in property is sufficient to warrant the appointment of a guardian or administrator to protect or determine the alleged interest. Bancroft Probate Practice, Vol. I, p. 57, states that,

"The sole purpose of instituting probate proceedings may, however, be to obtain necessary authority to commence a suit to recover for the

conversion of the only property of the estate, or a suit to set aside a conveyance made by the testator prior to his death."

Two cases are cited in support of this rule: *De Ledesma* v. *Stanley,* 57 Cal. App. 470, 207 P. 693, and *In re Miller's Estate,* 130 Wash. 199, 226 P. 493. The same principle applies and the reasons maintain for the appointment of a guardian under like circumstances.

The guardianship of a person having no estate would partake largely of personal elements; but the appointment of a guardian solely for the determination of the nature and quantum of an estate, like an administration of an estate, is an action in rem. *Barrette* v. *Whitney,* 36 Utah 574, 106 P. 522, 37 L. R. A., N. S., 368; *In re Estate of Tasanen,* 25 Utah 396, 71 P. 984.

As indicated, the record discloses that there is material and substantial evidence to sustain the findings of the court. That there may be evidence from which other findings might have been made, takes us outside of considering the sufficiency of the evidence to sustain the findings made. In cases of this kind, we may not ignore or disregard the findings made and the decision arrived at within the fair interpretation of the evidence before the court. *In re Swan's Estate,* 51 Utah 410, 170 P. 452; *In re Jones' Estate,* 59 Utah 99, 202 P. 206; *In re Dong Ling Hing's Estate,* 78 Utah 324, 2 P. 2d 902; *In re Hanson's Estate,* 87 Utah 580, 52 P. 2d 1103.

It having been agreed at the beginning of the trial that the court in the proceeding then pending would not, or should not, try the question of the validity of the deeds, the only question then before the court was whether a guardian of the estate of Mary Lamont should be appointed. The allegation that deeds had been made that were invalid, the validity of them questioned, that there were claims against property alleged to be the property of the alleged incompetent, upon finding of incompetency, was sufficient to warrant the court to take jurisdiction of the

alleged res and if the guardian finds sufficient to warrant such action, a proceeding to determine such issues may be brought.

The judgment of the lower court is affirmed. Respondents to recover costs.

FOLLAND, C. J., and EPHRAIM HANSON, WOLFE, and LARSON, JJ., concur.